FILED

08/14/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs April 26, 2017 at Knoxville

**STATE OF TENNESSEE v. JONATHAN C. BUCKNER**

**Appeal from the Circuit Court for Houston County**
**No. 2015-CR-3     Suzanne Lockert-Mash, Judge**

**No.  M2016-01162-CCA-R3-CD**

The Defendant, Jonathan C. Buckner, was convicted by a Houston County Circuit Court jury of theft of property valued at $1,000 or more but less than $10,000, a Class D felony. *See* T.C.A. § 39-14-103 (2014).  The trial court sentenced the Defendant as a Range III, persistent offender to twelve years' confinement and ordered that his sentence be served consecutively to a sentence in an unrelated case.  On appeal, the Defendant contends that the trial court erred (1) by failing to provide witnesses and prospective jurors proper instructions before jury selection, (2) by admitting inadmissible hearsay evidence, (3) by denying his two motions for a mistrial, (4) by overruling defense objections during the prosecutor's opening statement and closing argument, and (5) during sentencing.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ. joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Jonathan C. Buckner.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Ray Crouch, District Attorney General; and Talmage Woodall, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a December 9, 2014 incident in which the Defendant test drove an all-terrain vehicle (ATV) owned by Dylan Hutchinson.  The Defendant was indicted for theft of property valued at $10,000 or more but less than $60,000, a Class C felony.  At the trial, Mr. Hutchinson testified that he posted an online advertisement on Craigslist to sell his 2013 Polaris Razor ATV for $10,500.  Mr. Hutchinson purchased the

ATV for $11,500 on May 30, 2014. Photographs of the ATV and the bill of sale, reflecting the vehicle identification number and sale price, were received as exhibits. After he purchased the ATV, Mr. Hutchinson spent $7,000 on upgrades.

On December 9, 2014, at 7:00 a.m., the Defendant called Mr. Hutchinson regarding purchasing the ATV. The Defendant wanted to view the ATV immediately and told Mr. Hutchinson that he was leaving the state to "ride tomorrow" and needed to purchase another ATV because the Defendant's ATV was not operational. The Defendant offered $10,000 cash during the telephone conversation, and Mr. Hutchinson accepted. The Defendant told Mr. Hutchinson he was from "Cumberland Furnace" and arrived at Mr. Hutchinson's home around 9:00 a.m. with Tracy Manning and a U-Haul vehicle. The Defendant did not provide his name to Mr. Hutchinson, but Mr. Hutchinson agreed to allow the Defendant to take the ATV for a test drive before paying for it because the Defendant wanted to ensure the transmission did not slip or become hot. Mr. Hutchinson told the Defendant to "take it up the driveway and come back down here," but the Defendant drove the ATV off Mr. Hutchinson's property. The Defendant left his toboggan and sunglasses with Mr. Hutchinson, but Mr. Hutchinson denied looking at the toboggan or noticing an envelope of money inside the toboggan.

Austin Black, Mr. Hutchinson's cousin, was present when the Defendant and Ms. Manning arrived. After the Defendant drove the ATV off Mr. Hutchinson's property, Mr. Black stayed with Ms. Manning, and Mr. Hutchinson left to find the Defendant. Mr. Hutchinson saw Erin Police Chief Moore when Mr. Hutchinson was attempting to find the Defendant, and Mr. Hutchinson explained that the Defendant had stolen the ATV. Police Chief Moore and Mr. Hutchinson drove to Mr. Hutchinson's home, and Police Chief Moore questioned Mr. Hutchinson, Mr. Black, and Ms. Manning. Mr. Black told the police that he did not see the Defendant and Mr. Hutchinson exchange money before the Defendant drove away on the ATV but that the Defendant gave his toboggan to Mr. Hutchinson before leaving on the ATV. Mr. Black recalled that before the Defendant left on the ATV, the Defendant mentioned living on "Buckner Loop," but Mr. Black did not "get wherever [the Defendant] lived." Mr. Black did not talk to Ms. Manning and left the home after speaking to the police. At some point, Mr. Hutchinson called his father, Tommy Hutchinson, about the incident, and Tommy Hutchinson came to the home. After the police left the home, Dylan and Tommy Hutchinson left to continue looking for the Defendant and the ATV.

Dylan and Tommy Hutchinson received information from Terry Buckner, Dylan Hutchinson's coworker, that the ATV could have been in the Cumberland Furnace area, and Dylan Hutchinson informed the police of the information and drove to Cumberland Furnace. The Hutchinson men found the Defendant and the ATV on Buckner Loop behind a home, but the Defendant drove the ATV into a field. Dylan Hutchinson informed the police that he had found the ATV, drove his truck into the field following the Defendant, and Dylan and Tommy Hutchinson got out of Dylan Hutchinson's truck.

Tommy Hutchinson stood blocking the only exit to the fenced-in field, and the Defendant "came down the hill wide open" at Tommy Hutchinson. Dylan Hutchinson estimated the ATV's speed at sixty-eight miles per hour, which was the ATV's maximum speed. Tommy Hutchinson pulled out an unloaded pistol and inserted the magazine clip when it became clear the Defendant was not going to stop the ATV. Tommy Hutchinson fired the pistol twice, and the Defendant turned the ATV around, drove in the opposite direction, and "busted out of the fence" onto the roadway.

By this time, Dylan Hutchinson's brother arrived in his truck and chased the Defendant but "lost" the Defendant during the pursuit. Tommy Hutchinson called the police to inform them of what had occurred, and all three Hutchinson men met at a nearby intersection and waited for Montgomery County Sheriff's Detective Moss to arrive. The detective told the men to wait at the intersection and drove away attempting to find the Defendant and the ATV. The detective returned a few minutes later following the Defendant and the ATV. The Hutchinson men had the roadway blocked with their trucks, but the Defendant did not stop and drove over a driveway and through another field. Dylan Hutchinson followed the Defendant, but the Defendant did not stop the ATV until Josh Bateman, Tommy Hutchinson's coworker, struck the ATV with a truck. Dylan Hutchinson got out of his truck, approached and grabbed the Defendant, and was told by the police to "back off."

Tracy Manning testified that she went with the Defendant to Mr. Hutchinson's home because the Defendant said he was going to purchase an ATV for a friend, who wanted it for the friend's wife. She and the Defendant picked up the U-Haul truck from the Defendant's friend, and the Defendant drove the truck to Mr. Hutchinson's home. The Defendant agreed to pay her $50 for her time. She called and sent text messages to the Defendant's cell phone when she realized the Defendant had been gone too long on the "test drive." She identified herself to the police officers who came to Mr. Hutchinson's home but told the officers the Defendant's name was Jason. She thought she told the officers the Defendant's last name was Evits, but she was uncertain.

Erin Police Officer Jamie Patterson testified that on the day of the incident, he was off duty in his personal vehicle when he saw the ATV traveling around sixty miles per hour on Main Street. He saw the Defendant drive the ATV recklessly, almost causing several motor vehicle accidents. Officer Patterson called Police Chief Moore about the ATV and provided information related to the direction in which the ATV traveled.

Erin Police Chief Mark Moore testified that he received information about the ATV being driven recklessly and that he attempted to find it. Chief Moore stopped at "Sudden Service" and was approached by Dylan Hutchinson, who told him about the day's events and about Ms. Manning's remaining at Mr. Hutchinson's home. Police Chief Moore drove to Mr. Hutchinson's home. Ms. Manning told Police Chief Moore that the Defendant's name was Jason Evits, but Mr. Hutchinson said the photograph

associated with Jason Evits' driver's license did not reflect the person who drove away on the ATV.

Police Chief Moore and Houston County Sheriff's Deputy Hooper took Ms. Manning to the Houston County Sheriff's office for questioning. Police Chief Moore received a telephone call from Mr. Hutchinson, who reported finding the ATV and the Defendant. Police Chief Moore relayed the information to Montgomery County law enforcement officers, who found Mr. Hutchinson, the Defendant, and the ATV. A police pursuit began, and Police Chief Moore and Deputy Hooper left the Houston County Sheriff's Office and joined the pursuit. The Defendant was inside an ambulance when they arrived at the scene, and the Defendant was later released and taken into police custody. Police Chief Moore recalled the Defendant stated that he took the ATV but that he paid "some money" for it.

Montgomery County Sheriff's Deputy Ethan Moss assisted the Houston County Sheriff's Department in locating the Defendant and the ATV. Deputy Moss turned on his blue lights after locating the ATV, but the Defendant "fled" the area. The Defendant waved at Deputy Moss during the pursuit, which lasted about fifteen minutes and ended with Josh Bateman's driving a truck into the ATV. The Defendant told Deputy Moss that the Defendant thought the police, Mr. Hutchinson, and Mr. Hutchinson's family were trying to kill him. A video recording from Deputy Moss's police car of the pursuit was played for the jury.

The Defendant, who said he had pleaded guilty to reckless endangerment, robbery, and aggravated robbery in previous cases, testified that he was purchasing the ATV for a friend, Steve, who wanted the ATV for his wife. The Defendant said that he and Ms. Manning arrived at Mr. Hutchinson's home, that the men discussed the ATV, and that the Defendant mentioned having family in the Cumberland Furnace area. The Defendant was prepared to pay $8,500, which was inside his jacket pocket. Mr. Hutchinson permitted the Defendant to drive the ATV, and the Defendant removed an envelope of cash from his jacket, placed it in a toboggan, and gave the toboggan to Mr. Hutchinson to hold until he returned from the test drive. The Defendant said Mr. Hutchinson told the Defendant to drive the ATV on Mr. Hutchinson's property, but the Defendant told Mr. Hutchinson that he wanted to drive it on the road and "open it up." The Defendant said Mr. Hutchinson did not "say no or anything" and denied attempting to drive away and not return.

The Defendant testified that during his test drive, Ms. Manning sent him a text message telling him not to return to Mr. Hutchinson's home because the men claimed the Defendant had stolen the ATV. The Defendant called Ms. Manning, who informed him the police were at Mr. Hutchinson's home, and the Defendant ended the call without mentioning the $8,500. The Defendant said that he did not return the ATV because of his previous experiences with the police and that he planned to abandon it somewhere and

later inform Mr. Hutchinson of the location. The Defendant drove to his parents' home but did not hide the ATV inside the garage. The Defendant saw a truck, a passenger holding a pistol out of the truck's window, and heard a gunshot, prompting the Defendant to "take off" on the ATV. The Defendant drove into a field and was followed by the truck, and he said Tommy Hutchinson fired a gun three or four times at him. The Defendant denied driving the ATV directly toward Tommy Hutchinson. The Defendant was scared, drove away from the truck, and was ultimately hit by another truck. The Defendant said the incident was a misunderstanding about where he could drive the ATV.

Upon this evidence, the Defendant was convicted of theft of property valued at $1,000 or more but less than $10,000. This appeal followed.

## I.      Witness and Juror Instructions

The Defendant contends that the trial court erred by failing to instruct trial witnesses not to sit in the courtroom gallery among the prospective jurors before jury selection began. The Defendant argues that a small adjacent room to the courtroom should have been used for trial witnesses to prevent witnesses from interacting with the prospective jurors on the first day of the trial. He argues, without citation to legal authority, that the interaction deprived him of his right to a fair trial. The State responds that the issue is waived because the Defendant failed to cite to legal authority in his brief and alternatively, that the Defendant has failed to show prejudice resulting from witnesses and prospective jurors being present inside the courtroom before the trial began.

As a preliminary matter, the Defendant references a pretrial motion hearing in which the trial court granted his motion for "witness sequestration" in accordance with Tennessee Rule of Evidence 615. The Defendant argues that although the State knew that its witnesses were not to be present inside the courtroom, the witnesses were inside the courtroom until the prosecutor requested a bench conference, resulting in the trial court's requesting that trial witnesses stand and leave the courtroom. However, the record does not reflect any motion or trial court order relative to Rule 615. We note that the Defendant's brief cites neither to the relevant portion of the record regarding the motion, although he cites to three pages of the trial transcript relative to when the bench conference occurred before the trial began, nor to any legal authority supporting his argument that his right to a fair trial was denied. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

In any event, the record fails to reflect that the defense objected to the manner in which the trial court conducted the proceedings. When the trial court came to order on the first day of the trial, the trial judge told the venire of prospective jurors to come forward from the gallery to be seated in the jury box when the juror's name was called by

the court clerk. The judge noted the courtroom was small but that names would be called until the jury box seating was full with thirteen prospective jurors. After the court clerk called the first prospective juror's name, the prosecutor requested a bench conference. The bench conference was "had off [the] record," and any statements made by the prosecutor, defense counsel, and the judge are not reflected in the transcript.

After the bench conference concluded, the trial judge stated, "Any witnesses that are present would you please stand – witnesses for this case, so you're already standing." The prosecutor noted that Officer Patterson, the State's designated prosecuting officer, was also in the courtroom. The judge stated

> Those of you who will be witnesses in this case I'm going to have to ask you to step out and stay outside of the presence of this Court until you are called in to testify. While you are outside or wherever you are do not discuss this case with anyone until completion of this case.
>
> Once you are called in to testify, if you are excused, then you may sit in the courtroom to watch the proceedings; but you are still not to discuss your testimony with anyone until it is completed.
>
> So if you will, if you will step outside until you are called. There's a table at the very end of the hall you can go back there and have a seat.

The record reflects that the witnesses complied with the judge's instructions, and the court clerk resumed calling prospective jurors to enter the jury box.

The record does not reflect that the defense objected to the witnesses being inside the courtroom. To the contrary, the prosecutor sought a bench conference just before the trial court instructed the witnesses to leave the courtroom. Furthermore, because the transcript does not reflect what was stated during the bench conference, this court is unable to determine what the parties discussed, whether the defense objected to the manner in which the trial court resolved the potential issue, or whether the defense alleged the Defendant's right to a fair trial had been denied because witnesses had been inside the courtroom gallery with prospective jurors. Because the record does not reflect that the defense objected, the issue is waived. *See* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The Defendant is not entitled to relief on this basis.

## II.     Hearsay

The Defendant contends that the trial court erred by allowing Tommy Hutchinson and Police Chief Mark Moore to provide testimony relative to Dylan Hutchinson's

-6-

statements at the time of the offense. He argues that the evidence was inadmissible hearsay and that the evidence violated his right to a fair trial. The State responds that the trial court properly allowed the testimony.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

### A.      Tommy Hutchinson

The record reflects that during Tommy Hutchinson's testimony, the prosecutor asked if he recalled his son, Dylan Hutchinson, calling him about the incident. Tommy Hutchinson recalled receiving a telephone call from his son around lunchtime. The prosecutor asked what Dylan Hutchinson said during the telephone call, and the defense objected on the basis of inadmissible hearsay. The prosecutor responded that Dylan Hutchinson had already testified, and defense counsel said, "That doesn't matter." The trial court overruled the objection and determined that Dylan Hutchinson had already testified and had been subject to cross-examination by the defense relative to what Dylan Hutchinson told his father during the telephone conversation. Tommy Hutchinson then testified that Dylan Hutchinson reported "that a guy . . . come to test drive his [ATV] . . . and hadn't returned" and that Dylan Hutchinson thought the person "stole it." Tommy Hutchinson testified that upon hearing this information, he told Dylan Hutchinson to call the police and that Tommy Hutchinson left work and drove to Dylan Hutchinson's home.

The State argues on appeal that the statement was not offered for the truth of the matter asserted that the Defendant stole the ATV but rather, that the testimony was to show why Tommy Hutchinson came to his "son's assistance," which is in essence an assertion that the testimony regarding the conversation was to show the effect the conversation had on Tommy Hutchinson. We disagree. The prosecutor did not respond to the hearsay objection that the testimony was to show the effect on Tommy Hutchinson. The prosecutor's response that Dylan Hutchinson had already testified shows that the testimony was offered for its truth. The trial court's statements support this conclusion, as well, and we note the court did not state that the testimony was not offered for its truth. Therefore, the testimony was hearsay in the manner it was offered. Furthermore, no exception to the rule barring the admission of hearsay evidence applied, rendering its admission erroneous.

However, the admission of the testimony was harmless because Dylan Hutchinson had previously testified he called his brother and his father on the telephone to tell each of them that "somebody had stole[n] the [ATV]." Dylan Hutchinson identified the Defendant as the person who took the ATV during his testimony. Dylan Hutchinson also testified that his brother and father both left work, that Tommy Hutchinson came to Dylan Hutchinson's home, and that after the police left Dylan Hutchinson's home, Dylan and Tommy Hutchinson left to search for the Defendant and the ATV. Therefore, the record reflects that during Dylan Hutchinson's testimony, the jury was presented evidence that Dylan Hutchinson believed the Defendant had stolen the ATV and that he had relayed this information to his father, Tommy Hutchinson. We note that Dylan and Tommy Hutchinson were each subject to cross-examination. As a result, the Defendant is not entitled to relief on this basis.

## B.    Police Chief Moore

Relative to Police Chief Moore, the record reflects that during direct examination, Chief Moore stated that he received a telephone call from Dylan Hutchinson on the day of the incident. The prosecutor asked Chief Moore what Dylan Hutchinson said during the conversation, and the defense objected on the basis of hearsay. The court, without obtaining a response from the prosecutor, determined that the evidence was not being offered for its truth and that Dylan Hutchinson had already testified. Chief Moore was permitted to testify about Dylan Hutchinson's stating that he thought the Defendant had stolen the ATV. The State, again, argues on appeal that the evidence was not offered for its truth but rather to show the effect Mr. Hutchinson's information had on Chief Moore as it related to the police investigation, although this explanation was not provided at the trial.

In any event, the record reflects that immediately after asking Chief Moore about the conversation, the prosecutor asked what Chief Moore did after receiving information from Mr. Hutchinson. This supports the trial court's determination that the testimony was offered to show the effect the information had on Chief Moore, specifically how Chief Moore investigated the allegation. The Defendant is not entitled to relief on this basis.

## III.    Motions for a mistrial

The Defendant requested two mistrials during the trial, which the trial court denied. The motions relate to a juror's observing the Defendant in a holding room during a trial recess and to a witness's testifying to information that was excluded by the court during a jury-out hearing. The State responds that the trial court properly denied the motions.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

### A. Juror Encounter

The record reflects that after the jury was selected and the Defendant pleaded not guilty, the trial court addressed various matters outside the presence of the jury. The defense requested a mistrial on the basis that a juror saw the Defendant in a holding area during a previous recess. Trial counsel told the court that the Defendant was sitting in the holding room when a juror, who was looking for water, looked inside the room and made eye contact with the Defendant. The court explained that the room at issue was a "holding cell with a regular door on it" with no sign designating the room's use. The court noted that the Defendant was dressed in "street clothes," was not shackled or handcuffed, and was not being escorted from the room to the courtroom by police officers but rather by counsel. The court found that no evidence showed the Defendant was restrained or confined.

The trial court identified the juror who was alleged to have seen the Defendant inside the room, and after an open courtroom discussion, the trial judge requested Youth Services Officer Lori Tifft testify about the incident. Upon examination by the court, Officer Tifft testified that her office was to the right of the relevant holding room. She said that as she walked up the stairs during a court recess, a juror stopped her and asked where the juror could find a bottle of water. Officer Tifft offered the juror water, which was inside the officer's office, and the officer and the juror walked to the officer's office. Officer Tifft said that her office door was open, that the juror waited at the door for the water bottle, and that the juror's back was toward the holding room, which had a small window covered with paper. Officer Tifft said the juror immediately entered the courtroom after receiving the water. Officer Tifft agreed that the window on the holding room door had been covered with paper at all times and that it was impossible for the juror to have seen through the window.

On cross-examination, Officer Tifft said that the paper covered the entire widow on the holding room door, except for "a little gap on the side." She said she did not know at what the juror looked when Officer Tifft retrieved the bottle of water. She said, though, it took about two or three seconds to retrieve the water and hand it to the juror.

The trial court found that no evidence showed the room appeared to be a "holding cell" because of the nature of the door and the absence of bars. The prosecutor and trial counsel examined the door and agreed that it did not have a door knob and that on the window, a one-inch gap on one side of the window and a smaller gap on the other side of the window was not covered by the paper.

The trial court questioned the juror outside the presence of the remaining jurors, after informing the juror that the juror had done nothing wrong. The juror agreed that after the juror had walked downstairs looking for water, the juror saw an officer and asked where to find water. The juror said that the officer offered her a bottle of water, that that the juror and the officer walked to an office, and that the juror waited outside the office while the officer retrieved a bottle of water. She said that the incident lasted two minutes. The juror denied that she saw the prosecutor, trial counsel, trial witnesses, or the Defendant while she waited in the hallway for the bottle of water. The juror said she returned to the courtroom immediately after receiving the bottle of water. The juror said that she did not notice an office behind her while she waited in the hallway, that she did not turn around while she waited for the water, and that she did not notice an office to the right when she and the officer walked up the stairs.

After the juror was excused to the jury room, trial counsel stated that the Defendant reported that the juror saw the Defendant inside the holding room during a recess and that the Defendant and the juror "made eye contact." The trial court found that the Defendant was not wearing jail clothes and was not shackled or handcuffed. The court credited the juror's testimony that she did not see anyone other than Officer Tifft when the juror was waiting for the bottle of water. The court noted that the juror was told she did not do anything wrong and found that the juror was not under duress when she testified. The court denied the motion for a mistrial.

The record reflects that the trial court did not abuse its discretion by denying the motion for a mistrial. Although the defense argues that the juror made eye contact with the Defendant when the Defendant was inside the holding room, no evidence supports his claim. The trial court conducted an extensive inquiry by questioning Officer Tifft and the juror. Officer Tifft and the juror testified that neither saw anyone when the juror waited in the hallway for Officer Tifft to retrieve a water bottle. No evidence showed that the juror or the officer saw the Defendant inside the holding room. The Defendant is not entitled to relief on this basis.

## B.    Previously Excluded Evidence

During Tommy Hutchinson's direct testimony, the prosecutor asked Mr. Hutchinson why he had the firearm when he and his son were following the Defendant. Mr. Hutchinson replied, "When Officer Moore . . . had told me the suspect and everything." The prosecutor interrupted and requested a bench conference. Although the

statements made during the conference are not reflected in the trial transcript, a jury-out hearing was held.

During the jury-out hearing, the prosecutor continued questioning Mr. Hutchinson. Mr. Hutchinson stated that he had the pistol inside the truck because "we did not know what we was going to run into." Mr. Hutchinson said that Police Chief Moore told him about the Defendant's aliases and previous criminal record. The trial court instructed Mr. Hutchinson not to mention this discussion during his trial testimony. Mr. Hutchinson responded, "Yes, ma'am."

When the trial resumed, the prosecutor asked Mr. Hutchinson why he felt he needed a pistol on the day of the incident. Mr. Hutchinson responded, "Just for the fact someone stole [the ATV] and then one of the aliases he give was just – just for the fact he stole his –." The trial court interjected and sent the jury out of the courtroom.

During the jury-out hearing, the trial court admonished Mr. Hutchinson. The court explained that the reason it sent the jury out of the courtroom was to explain to him not to mention the information provided by Police Chief Moore. The court noted that Mr. Hutchinson referenced the information, although the court had previously instructed him not to mention it. Mr. Hutchinson apologized, and the court instructed him again not to "say anything about what the Chief told you or anything of that nature." Mr. Hutchinson replied, "Yes, ma'am."

The defense immediately made a motion for a mistrial, which the trial court denied. The court stated, "The statement was because of the aliases he . . . didn't identify or did not say, so I don't think that he presented anything, so I will admonish the jury when they come in to disregard anything that's been said." Trial counsel did not respond.

When the trial resumed, the trial court instructed the jury as follows:

> Ladies and Gentlemen, if you remember my preliminary instructions I instructed you that there may be times I have to make rulings on evidence; and if I ask you to disregard something, you are to disregard it and not refer to that in your deliberations. So I will ask you to disregard the last statement made by the witness and not to take that into evidence nor to consider that in your deliberations. Does everyone understand that?

The court noted that the jurors nodded affirmatively, indicating they understood the court's instruction.

Mr. Hutchinson violated the trial court's order by testifying that Police Chief Moore had provided information about the Defendant's aliases. However, Mr. Hutchinson's comment was general, he did not provide details about any aliases, and the

-11-

trial court immediately interjected when the aliases were mentioned. The court admonished Mr. Hutchinson for violating its order and provided an extensive instruction to the jury to disregard Mr. Hutchinson's last statement. The jurors indicated they understood the instruction. *See State v. Richardson*, 697 S.W.2d 594, 596 (Tenn. Crim. App. 1985) ("The jury is presumed to have followed the trial court's instructions."). The comment had minimal impact, and therefore, the Defendant failed to establish a manifest necessity. We conclude that the trial court did not abuse its discretion by denying the Defendant's request for a mistrial. He is not entitled to relief on this basis.

### IV.    Prosecutor's Opening Statement and Closing Argument

The Defendant contends that the trial court erred by overruling his objections during the prosecutor's opening statement, closing argument, and rebuttal argument. His contentions involve the prosecutor's reference during his opening statement to what the evidence would show at the trial, the prosecutor's reference during closing argument to the Defendant's previous theft-related criminal history, and the prosecutor's asking during rebuttal argument that the jury do the County and the State a "favor" by finding the Defendant guilty.

Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intended to prove." *State v. Reid*, 164 S.W.3d 286, 343 (Tenn. 2005). Opening statements are not evidence. *State v. Thompson*, 43 S.W.3d 516, 523 (Tenn. Crim. App. 2000). Trial courts should allow the parties to present "a summary of the facts supportive of the respective theories of the case, only so long as those 'facts are deemed likely to be supported by admissible evidence.'" *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012) (quoting *Stanfield v. Neblett*, 339 S.W.3d 22, 41-42 (Tenn. Ct. App. 2010)). Therefore, opening statements should "be predicated on evidence introduced during the trial" and should never refer "to facts and circumstances which are not admissible in evidence." *Sexton*, 368 S.W.3d at 415.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

## A.    Opening Statement

The Defendant alleges that the prosecutor made an impermissible argument during his opening statement by telling the jurors that the "only thing that stopped the [D]efendant on that day was a person driving a half ton pickup truck who had to ram and crash into" the ATV. The State responds that the comment was not improper argument but rather a statement relative to what the evidence would establish during the trial.

The record reflects the following during the prosecutor's opening statement:

> You might also hear the defendant almost ran over Mr. Tommy Hutchinson and he had to fire a weapon to stop him. And you'll hear and you'll see a video of a police chase that the Montgomery County Sheriff's deputies got involved in chasing Mr. Buckner through the Montgomery County line and Houston County line and the Dickson County line in that area of Cumberland Furnace and Indian Creek Road. It lasted about fifteen minutes; and that the only thing that stopped the defendant that day was a person driving a half ton pickup truck who had to ram him and crash into that vehicle.

The Defendant objected without elaboration, and the trial court overruled the objection and explained, "Well, this is opening statements and the state as well as yourself have a right to outline the facts that are expected to be proved."

The prosecutor concluded his opening statement with the following:

> As they are testifying I want you to think to yourself, are these the actions of somebody who would lawfully purchase this [ATV]? I would argue that it is not. I would argue that Mr. Buckner only intended to show up at [Dylan] Hutchinson's house and steal that [ATV] that day, that was his only intentions.

-13-

I will be asking at the conclusion of this trial, after you've heard all the proof that it is going to be overwhelming that Mr. Buckner is guilty of theft.

The record reflects that the Defendant did not object during this portion of the opening statement.

The portion of the prosecutor's opening statement relative to what stopped the Defendant during the police chase was not impermissible argument. The statement is a summary of the State's theory of the case and a statement of what the prosecutor expected the proof to show. We note the trial evidence supported the assertion that the Defendant stopped the ATV only after being rammed by a truck. However, the prosecutor's arguing that the Defendant only intended to steal the ATV was argument and is not permitted during opening statements. The prosecutor's asking the jurors to question, based upon the trial testimony, whether the Defendant's conduct was consistent with someone attempting to purchase the ATV was proper, but the argument in which the prosecutor claimed the Defendant's conduct shows the intent to "steal" should have been reserved for closing argument.

However, the Defendant did not object to the improper argument. *See* T.R.A.P. 36(a). Furthermore, no plain error appears upon review. *See State v. Smith*, 24 S.W.3d 274 (Tenn. 2000); *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994). The trial testimony showed that the Defendant fled from Mr. Hutchinson's property on the ATV, that the Defendant fled from the Hutchinson men and various law enforcement officers, and that the Defendant only stopped the ATV after it was struck by Josh Bateman's truck. We note that a video recording showing the police chase was presented to the jury, which supported the trial testimony. The Defendant is not entitled to relief on this basis.

## B.    Closing Argument

The Defendant argues that the prosecutor made an improper comment on the Defendant's propensity to commit the charged offense by referencing his previous convictions for aggravated robbery and robbery. The State responds that appellate review of the issue has been waived because the Defendant did not contemporaneously object to the prosecutor's reference to the Defendant's previous convictions.

The record reflects the following during the prosecutor's closing argument:

Now you also heard from Mr. Buckner and he said some interesting things today. He said that he gave [Dylan Hutchinson 8,500] dollars and he put it in a toboggan and he left it there for him before he got in the [ATV]. But ask yourself, do you believe him based on his criminal history, based

-14-

on his four or five felony convictions, two of which are aggravated robbery and robbery both involving theft which is exactly what is on trial for today.

The Defendant did not object to the prosecutor's reference to the Defendant's previous convictions or the prosecutor's blatant attempt to show the Defendant's propensity to commit the charged offense based upon two previous theft-related convictions. *See* T.R.A.P. 36(a); *see also* Tenn. R. Evid. 404(b). However, the Defendant raised this issue in his motion for a new trial. We will review the issue for plain error. *See Smith*, 24 S.W.3d at 274; *Adkisson*, 899 S.W.2d at 626.

The record reflects that before the trial, the defense filed a motion to determine the admissibility of the Defendant's previous convictions for impeachment purposes. Although no transcript from the motion hearing is included in the appellate record, the parties do not dispute that the trial court determined that the Defendant's theft-related convictions were admissible for impeachment pursuant to Tennessee Rule of Evidence 609 should the Defendant testify at the trial. The record does not reflect a motion to exclude evidence of the prior convictions pursuant to Tennessee Rule of Evidence 404(b).

The Defendant argued in his motion for a new trial that the prosecutor's argument was impermissible because it encouraged the jurors to conclude that the Defendant committed the present offense simply because the Defendant had committed previous thefts. The prosecutor did not respond specifically to this issue at the motion hearing. Relative to the prosecutorial misconduct allegation, trial counsel argued that the prosecutor's argument violated Tennessee Rule of Evidence 404(b) because it was propensity evidence. The trial court's only determination regarding the State's closing argument was that the trial judge "didn't feel that there's any error in those," and the order denying the motion for a new trial states the motion is denied without reference to any specific allegation.

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

-15-

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

The record reflects that witness credibility was a significant factor in determining the Defendant's guilt. The parties agreed that the Defendant's previous theft-related cases were admitted solely for purposes of impeaching the Defendant's credibility in the event the Defendant testified at the trial. On direct examination, the Defendant admitted he had previous convictions, including convictions for aggravated robbery and robbery, and that he pleaded guilty in his previous cases because he was guilty. On cross-examination, the Defendant agreed the present case involved a theft.

Tennessee Rule of Evidence 609(a) allows evidence of a prior conviction for impeachment purposes, but the evidence "is limited to the fact of a former conviction and that the crime was committed." *State v. Taylor*, 993 S.W.2d 33, 35 (Tenn. 1999). Previous convictions, however, cannot be admitted as evidence to show a defendant's propensity to commit the charged offense, regardless of whether witness credibility is a central issue at a trial. *See* Tenn. R. Evid. 404(b). Generally, witness credibility is always an issue in any trial, and the prosecutor's argument was an invitation for the jury to convict the Defendant of the charged offense not based upon the evidence presented during the trial, but based upon the Defendant's previous criminal history. Our laws and rules of evidence do not permit such an argument. We conclude the prosecutor's argument was impermissible and "injected issues broader than the guilt or innocence of the accused under the controlling law." *Goltz*, 111 S.W.3d at 6. Therefore, the argument constituted prosecutorial misconduct.

Although it did not happen in this case, the trial court would have been within its purview by interjecting and admonishing the prosecutor for his improper argument and by providing an instruction regarding the limited scope of the Defendant's previous convictions pursuant to Rule 609. *See* T.P.I—Crim 42.07 (19th ed. 2015). The record shows, too, that the court did not provide the relevant jury instruction pursuant to Rule 609 when the Defendant testified or during its final instructions to the jury before it began deliberations. The impropriety of the prosecutor's argument is, therefore, compounded by the lack of a proper jury instruction directing the jurors about the permitted use of the Defendant's previous convictions.

In determining that the prosecutor engaged in misconduct, we have not overlooked the State's argument that this issue is without merit because the defense relied upon the Defendant's pleading guilty to the previous convictions in the closing argument to bolster his credibility. We are not persuaded. Although the Defendant was permitted to explain to the jury during his trial testimony that he pleaded guilty in his previous cases because he was guilty, this testimony does not entitle the State to argue during closing argument that the Defendant is guilty based upon previous convictions. The prosecutor's closing argument was not in response to any argument proffered by the defense. Once the State improperly invited the jury to convict the Defendant based upon his previous theft-related convictions, and not the evidence presented during the trial, the defense had no choice but to address the convictions in its closing argument.

We conclude, though, that the record shows overwhelming evidence of the Defendant's guilt. Therefore, the Defendant is unable to establish the prosecutor's argument affected the outcome of the trial to the defendant's prejudice. Although we are frustrated by the State's propensity argument and the lack of proper jury instructions by the trial court, the Defendant is unable to establish that a substantial right was affected. We caution the State, though, that a similar argument in another case in which the evidence is not overwhelming might result in a reversal of a conviction and that compliance of the Rules of Professional Responsibility is expected. *See* Tenn. Sup. Ct. R. 8; Tenn. R. Prof. Conduct 8.4(d). The Defendant is not entitled to relief on this basis.

## C.     Rebuttal Argument

The Defendant argues that during the prosecutor's rebuttal argument, he exhorted the jury to "do the citizens of Houston County and the State of Tennessee a favor by finding the Defendant guilty." The Defendant alleges the comment was prosecutorial misconduct. The State responds that the Defendant is not entitled to relief because he did not object to the prosecutor's comment and, alternatively, that the overwhelming evidence of the Defendant's guilt prevents any appellate relief. Notably, the State does not argue the prosecutor's statement was proper, but rather, it asserts that even if the Defendant had objected contemporaneously, "the error is not sufficient to warrant relief."

The record reflects the following during the prosecutor's rebuttal argument:

> The State argues that the proof is overwhelming in this case against Mr. Buckner for the offense of theft over ten thousand dollars. I'm going to ask you to let your mind rest easy, do the victim a favor, do Houston County a favor and go back in that jury room and find Mr. Buckner guilty of theft over ten thousand.

The record reflects the Defendant did not object at this juncture. *See* T.R.A.P. 36(a). However, the Defendant raised this issue in his motion for a new trial. We will review the issue for plain error. *See Smith*, 24 S.W.3d at 274; *Adkisson*, 899 S.W.2d at 626.

We conclude that the prosecutor's argument that the jurors should do the victim and the county a favor by finding the Defendant guilty was impermissible and was prosecutorial misconduct. *See Goltz*, 111 S.W.3d at 8 ("The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law[.]"). Furthermore, the trial court should have interjected, admonished the prosecutor to limit his argument to the trial evidence and the inferences to be drawn from the evidence, and instructed the jurors accordingly.

We conclude, though, that the record reflects overwhelming evidence of the Defendant's guilt. Therefore, the Defendant is unable to establish the prosecutor's argument affected the outcome of the trial to the Defendant's prejudice. Although we are frustrated by the State's argument and the lack of proper contemporaneous jury instructions by the trial court, the Defendant is unable to establish a substantial right was affected. We, likewise, conclude that the outcome of the trial was not affected to the Defendant's prejudice by the cumulative impact of errors in the prosecutor's initial closing and rebuttal arguments, as the evidence was overwhelmingly sufficient to support the Defendant's conviction. We note that although the Defendant was charged with Class C felony theft, the jury convicted him of Class D felony theft. The Defendant is not entitled to relief on this basis.

## V.    Sentencing

The Defendant contends that the trial court erred during sentencing. His contentions focus on the court's determination regarding the Defendant's offender classification, the court's commenting on the plea offer extended to the defense, and the court's imposing the maximum sentence of twelve years.

At the sentencing hearing, the presentence report was received as an exhibit. The report showed that the Defendant had previous convictions for theft of property valued at $1,000 or more but less than $10,000, evading arrest, aggravated burglary, kidnapping,

-18-

two counts of aggravated robbery, reckless endangerment with the use of a deadly weapon, robbery, and accessory to robbery. At the time of the sentencing hearing, the Defendant had pending charges in two other counties related to a high-speed police chase. The Defendant had a previous probation revocation and two parole revocations. The Defendant had two pending probation violations.

The presentence report showed that the Defendant was "a confirmed member" of the "Aryan Nation Security Threat Group." He had completed high school and reported having good physical and mental health. The Defendant denied abusing alcohol and admitted using and selling methamphetamine. He reported having a good relationship with his parents. The Defendant reported working in the construction and vehicle repossession industries and having his own business from 2013 until his arrest in this case. The presentence investigator classified the Defendant as a "maximum risk" based upon the offender risk assessment.

Dylan Hutchinson testified that he obtained the repair estimates for approximately $7,000 damage. Mr. Hutchinson's insurance provider paid most of the expenses, although his out-of-pocket expenses were $331.94. He said that although the ATV was repaired, the experience was emotional and that he did not offer to sell items on Craigslist anymore. He requested the maximum sentence.

On cross-examination, Mr. Hutchinson testified that before the incident, the front axle was "out" and the front differential was "busted" but that the parts to repair those things were with the ATV at the time of the incident. Mr. Hutchinson repaired the ATV after the incident.

The trial court, in determining the Defendant's sentence, considered the presentence report, the nature and circumstances of the offense, and the evidence at the trial and the sentencing hearing. The court found that the Defendant had a twenty-year criminal history and that he had lived the "lifestyle . . . [of] a criminal." The court found that the Defendant was a thief who did not care about anyone else's property. The court found that the trial evidence showed the Defendant went to the victim's home with the intent to steal the ATV and that Tommy Hutchinson's shooting a firearm and Mr. Bateman's ramming the ATV were events the Defendant brought upon himself. The court found that for purposes of determining the offender classification, the Defendant had five previous felony convictions and that the Defendant was a Range III, persistent offender.

Relative to mitigating factors, the trial court found that the Defendant deserved "a little break" because he was "shot at" and "rammed" while driving the ATV. *See* T.C.A. § 40-35-113(13) (2014) ("Any other factor consistent with the purposes of this chapter[.]"). The court refused to find that the Defendant's conduct neither caused nor threatened serious bodily injury because theft of property could result in the owner's

attempting to recover the property without regard to whether lawful means were used to recover the property. The court did not condone the firearm use or ramming the ATV, but the court noted that people were tired of thieves taking their property. The court refused to find that the Defendant acted under provocation or attempted to compensate the victim. The court noted that the Defendant attempted to "hide" from the victim.

Relative to enhancement factors, the trial court found that factors (1), (8), and (13) applied. *See id.* § 40-35-114(1), (8), (13) (2014). The court found that factor (1) applied based upon the Defendant's multiple convictions in addition to those rendering him a Range III, persistent offender. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court found that factor (8) applied because the Defendant had previous probation and parole violations. *See id.* § 40-35-114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]"). The court found that factor (13) applied because the Defendant was serving a sentence on probation at the time of the offense. *See id.* § 40-35-114(13) ("At the time the felony was committed, . . . the defendant . . . [was] [r]eleased on probation[.]").

The trial court found that the Defendant understood his conduct. The court discredited the Defendant's trial testimony, finding the Defendant lied under oath. The court also found that the Defendant had not taken any responsibility for his conduct. The court found that the Defendant was a professional criminal who had devoted his life to criminal conduct and that the Defendant was on probation at the time of the offense. Relative to rehabilitation, the court found that the Defendant lacked the potential for rehabilitation based upon the Defendant's previous incarcerations and attempts to serve sentences on probation. The court, likewise, found that the Defendant would not comply with the rules of probation based upon the Defendant's previous conduct. The court found that society needed protection from the Defendant because he had no regard for other people or for the consequences of his criminal conduct. The court found that the Defendant had been unsuccessful when he received probation and parole and that probation in the present case would depreciate the seriousness of the offense. The court found that confinement would provide an effective deterrent to others likely to commit similar offenses. The court sentenced the Defendant to twelve years' confinement and ordered the sentence be served consecutively to his sentence in an unrelated case.

## A. Offender Classification

The Defendant alleges that the trial court erred by relying on the State's notice of intent to seek enhanced punishment to determine his Range III offender classification because the State's notice failed to comply with the statutory requirements. The State responds that it substantially complied with the statutory requirements and that it provided adequate notice of its intent to seek enhanced punishment upon conviction.

The record reflects that on April 9, 2015, the State filed a "Notice of Enhancement of Punishment." However, the Notice stated that the prosecution was providing notice pursuant to Tennessee Rules of Evidence 609 and 405 of its intent to use previous convictions for impeachment purposes should the Defendant testify at the trial. The notice identified six previous convictions, which included the following:

(1) An October 24, 2014 conviction for accessory after the fact in the Montgomery County Circuit Court in docket number 41400708, a Class E felony;

(2) An October 24, 2014 conviction for robbery in the Montgomery County Circuit Court in docket number 41301209, a Class C felony;

(3) A May 23, 2007 conviction for reckless endangerment with the use of a deadly weapon in the Montgomery County Circuit Court in docket number 40600444, a Class E felony;

(4) A February 29, 2000 conviction for aggravated robbery in the Montgomery County Circuit Court in docket number 41082(A), a Class B felony;

(5) A February 29, 2000 conviction for kidnapping in the Montgomery County Circuit Court in docket number 41082(A), a Class C felony; and

(6) A March 8, 2001 conviction for aggravated robbery in Montgomery County Circuit Court in docket number 40000559, a Class B felony.

On the same day, the State filed a "Notice of Intent to Use Convictions or Prior Bad Acts for Impeachment Purposes." The notice stated that the prosecution was providing notice pursuant to Tennessee Rules of Evidence 609 and 405 of its intent to use previous convictions for impeachment purposes should the Defendant testify at the trial, and it identified the same six previous convictions.

The trial occurred on July 23, 2015. On August 3, 2015, the State filed an Amended Notice of Enhancement of Punishment, stating that it was providing notice of its intent pursuant to Tennessee Rules of Evidence 609 and 405 to use the Defendant's previous convictions for enhancement of punishment "should the defendant be found guilty at trial." The notice included the same six previous convictions and stated the prosecution was requesting the Defendant be classified as a Range III offender.

The State also filed on August 3, 2015, a "Memorandum in Support of the Amended Notice of Enhancement of Punishment." In relevant part, the memorandum stated that a July 16, 2015 hearing was held to determine which prior convictions were appropriate for impeachment purposes should the Defendant testify at the trial. According to the memorandum, at the July 16 hearing, the trial court addressed whether

-21-

the Notice of Enhancement of Punishment provided notice to the Defendant relative to the sentencing range the State would seek at a sentencing hearing. We note that the transcript from this July 16 hearing is not included in the appellate record. The memorandum stated that the State was filing the Amended Notice of Enhancement of Punishment to "add the specific range of punishment the State is seeking at the sentencing hearing" and to "replace 'impeachment purposes' with 'enhancement purposes.'"

Before the proof was presented at the sentencing hearing, a discussion was held regarding the Defendant's offender classification. The State sought a Range III classification. Trial counsel noted for the trial court that the April 9, 2015 document filed by the State was titled a notice for enhanced punishment but that the substance of the document was related to the Defendant's previous convictions for impeachment purposes at the trial, not offender classification for purposes of sentencing. Counsel argued that, therefore, no notice of the State's intent to seek enhanced punishment was filed before the trial because the amended notice was filed eleven days after the trial concluded. Counsel reminded the court that it noted on the day of the trial that the court file did not contain a notice relative to enhanced punishment but that the prosecutor stated he had filed a notice, which resulted in counsel's not "look[ing] at it any further" at that time. Relative to the State's amended notice filed after the trial, counsel requested that it be stricken from the record because an amended notice could not be filed after the trial and that the amended notice did not satisfy the requirements of Tennessee Code Annotated section 40-35-202(a).

The prosecutor relied upon the amended notice of intent to seek enhanced punishment to satisfy the statutory requirements in order to seek enhanced punishment. The prosecutor said that the trial court's position at an earlier date was that the State "needed to specifically state the range" and that he placed this information in the amended notice and filed it with the court. The prosecutor said he explained in his memorandum to the amended notice that if the trial court did not accept the amended notice, the State relied upon the original April 9, 2015 notice, although the substance of the notice referenced impeachment pursuant to Rules of Evidence 609 and 405, because it stated the nature and dates of the Defendant's previous felony convictions and identified the courts of convictions. The prosecutor conceded that the April 9 notice did not include certified copies of the judgments of conviction. Initially, he said that he had not filed certified copies of the judgments of conviction with the court but then said he could not recall whether he had filed them.

The trial court based its determination on the April 9, 2015 Notice of Enhancement of Sentence filed by the State and did not consider the amended notice. The court reviewed the convictions stated in the notice and requested proof relative to the offense dates and whether any of the offenses occurred within the same twenty-four hours. Four certified copies of judgments were received as an exhibit, showing

convictions for accessory after the fact with an offense date of February 20, 2014, robbery with an offense date of August 23, 2013, kidnapping with an offense date of February 16, 1999, and aggravated robbery with an offense date of February 16, 1999. Certified copies of the judgments of conviction for reckless endangerment and a second aggravated robbery were not entered into evidence, but the parties did not dispute the convictions could be considered separate convictions for purposes of determining offender classification. The court determined that the kidnapping and aggravated robbery convictions would only be considered as one conviction based upon the offense date and found that the Defendant had five previous felony convictions for purposes of determining the offender classification. The court asked whether trial counsel objected to the admission of the certified copies, and counsel did not.

The trial court determined that the April 9, 2015 Notice of Enhancement of Sentence and the notice of the State's intent to use the Defendant's previous convictions for impeachment purposes were filed on the same day and that the substance of the notices were identical. The court found that the Defendant received notice of his previous conviction offenses, the county in which he received the convictions, when the Defendant entered guilty pleas or was found guilty, the docket numbers, and the felony classification of the offenses. The court noted that the prosecution extended a written plea offer on April 2, 2015, in which the Defendant, in relevant part, would plead guilty as a Range III offender and that the defense knew based upon the plea offer that the State was "looking at Range III."

The trial court stated that it was not considering the amended notice because it still did not refer to Tennessee Code Annotated section 40-35-202. In determining whether the April 9, 2015 notice was materially misleading, the court found that the only error in the notice "is the bulk of the notice." The court found that the heading of the notice referred to enhanced punishment but that the body referred to Tennessee Rules of Evidence that relate to impeachment at a trial. The court relied upon *State v. Adams*, 788 S.W.2d 557 (Tenn. 1990), in determining that the State had substantially complied with Code section 40-35-202 and that although the notice was "[un]artfully drawn and probably mistakenly drawn," the heading of the notice should have placed the defense on notice that the State was seeking enhanced punishment. The court noted that the plea offer would have provided additional information relative to the State's intent to seek enhanced punishment. The court found that all of the relevant information regarding the Defendant's previous felony convictions was included in the April 9 notice that allowed the defense to determine the offender classification. The court determined that the notice was not misleading in any manner, provided all of the necessary information, was timely filed, and was, therefore, adequate. The court determined based upon the five previous felony convictions that the Defendant was a Range III, persistent offender.

Tennessee Code Annotated section 40-35-202 states, in relevant part,

> If the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial . . . . The statement, which shall not be made known to the jury determining the guilt or innocence of the defendant on the primary offense, must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions.

If the notice of intent to seek enhanced punishment is not "timely, the trial judge shall grant the defendant, on motion, a reasonable continuance of the trial." Tenn. R. Crim. P. 12.3(a).

The purpose of a notice of intent to seek enhanced punishment is to "provide fair notice to an accused that he is exposed to other than standard sentencing." *Adams*, 788 S.W.2d at 559. "Notice is important not only in preparation for a sentencing hearing, but in evaluating the risks and charting a course of action before trial." *Id*. The inquiry when a notice is timely but incorrect is "whether the notice was materially misleading." *Id*. "[W]hen the State has substantially complied with Section 40-35-202(a), an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." *Id*.

Fair notice, not perfect notice, is required. *See State v. Livingston*, 197 S.W.3d 710, 713 (Tenn. 2006). Fair notice requires "(1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, (3) setting forth the nature of the prior felony convictions, the dates of the convictions, and the identity of the courts of convictions." *Id.* at 713-14 (footnote omitted).

The record reflects that the prosecution filed two distinct notices on April 9, 2015. The first notice was titled Notice of Enhancement of Punishment. The second notice was titled Notice of Intent to use Convictions or Prior Bad Acts for Impeachment Purposes. The substance of the notices was identical and identified six previous felony convictions, the nature of the offenses, the dates of the convictions, the trial courts in which the Defendant was convicted, the trial court docket numbers, and the felony classification of each conviction. The titles of the notices show the State's intention to seek an enhanced sentence upon conviction and to use the Defendant's previous convictions for impeachment purposes should he testify at the trial. We conclude that the State substantially complied with the statutory requirement of providing notice of its intent to seek enhanced punishment with the six identified convictions. Although the notice relative to enhanced punishment referenced Rules of Evidence 609 and 405 and was the result of imprecise drafting by the State, the title itself shows that the purpose was to provide notice to the defense of the intention to seek an enhanced sentence upon

conviction. The notice identified all of the required information for the Defendant's six previous felony convictions, and the Defendant did not dispute the accuracy of the convictions. Therefore, the notice was not materially misleading, and once the defense received two identical notices with differing titles, the defense "was charged with inquiring into the ambiguous notice and demonstrating prejudice." *Adams*, 788 S.W.2d at 559. Furthermore, the Defendant has not established he was prejudiced by the poorly drafted notice. He did not challenge the convictions contained in the notice, only that the notice did not substantially comply with the statutory requirements. The Defendant was not misled or surprised. The Defendant is not entitled to relief on this basis.

## B.     Comment on the Plea Offer

The Defendant alleges that the trial court's reliance on the State's written plea offer in determining the adequacy of the State's notice of its intent to seek enhanced punishment was improper pursuant to Tennessee Rule of Evidence 408. The State responds that the trial court's reliance was not improper.

Tennessee Rule of Evidence 408 addresses compromises and offers to compromise in civil cases and does not apply in this case. *See* Tenn. R. Evid. 408; *see also* Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.08[2] (6th ed. 2011). Rule 410, however, addresses the inadmissibility of plea discussions and states the following:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceedings, admissible against the party who made the plea or was a participant in the plea discussions:
>
> . . .
>
> (4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty[.]

Tenn. R. Evid. 410(4); *see* Tenn. R. Crim. P. 12(d).

The record reflects that the memorandum in support of the State's amended notice of enhancement of punishment included a statement regarding an April 2, 2015 plea offer extended to the defense. The memorandum stated that the written offer was sent to the defense in an email and that the email was attached to the memorandum. The email is not included in the appellate record. In any event, the memorandum stated that the plea offer required the Defendant to plead guilty as a Range III offender. The State argued in the memorandum that the written plea offer provided additional notice to the Defendant that the State would seek Range III punishment upon conviction.

At the sentencing hearing, the defense referenced the memorandum and the plea offer and argued that the plea offer was irrelevant to sentencing. Although the defense cited to Rule 408, we glean from the record that trial counsel was referring to Rule 410. The trial court briefly referenced the plea offer in its extensive findings relative to whether the State provided adequate notice of its intent to seek enhanced punishment, as detailed in subsection A above.

We conclude that Rule 410 is not applicable in the present case. The rule relates to the inadmissibility of statements made by a defendant to a prosecutor during plea negotiations. The memorandum did not include statements by the Defendant in response to the plea offer, only that the plea offer included a term that would require the Defendant to plead guilty as a Range III offender. The additional terms of the plea offer or any discussions related to the offer are not included in the appellate record, and the transcript does not reflect that the trial court was aware of terms not identified in the State's memorandum.

In any event, we disagree that the trial court relied upon the purported plea offer in determining the adequacy of the State's notice of intent to seek enhanced punishment. The record does not reflect that the court relied upon the memorandum in support of the State's amended notice of its intent to seek enhanced punishment. The court stated that it was only considering the April 9, 2015 notice, not the amended notice, which included the memorandum's reference to the plea offer. Although the court noted that the plea offer requiring the Defendant to plead guilty as a Range III offender provided additional support for the conclusion that the Defendant knew the State would seek enhanced punishment, the court's ultimate determination regarding the adequacy of the notice was based upon the contents of the notice, not the plea offer.

However, even if the trial court relied upon the plea offer in determining the adequacy of the State's notice of intent to seek enhanced punishment, the Defendant is unable to establish prejudice. The record reflects that the State's notice was adequate, as detailed in subsection A above, without consideration of the offer. The Defendant was properly sentenced as a Range III offender, and he is not entitled to relief on this basis.

## C. Sentence Length

The Defendant contends that the trial court erred by sentencing the Defendant to twelve years. He argues that the court erroneously applied the enhancement factor that the Defendant had no hesitation about committing the offense when the risk to human life was high. The State responds that the court did not rely upon this enhancement factor and that the court properly sentenced the Defendant to twelve years.

-26-

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The record reflects that the trial court did not apply enhancement factor (10) in this case. *See* T.C.A. § 40-35-114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high[.]"). When determining the applicable enhancement factors, the court noted relative to factor (10) that after the Defendant took the ATV:

We had some high-speed chases. We had people ramming people. We had shooting.

This is a theft that, in and of itself, doesn't necessarily mean that you're going to have risk to human life, because he could have just as easily driven off and nobody gone after him. So I'm not really going to give that much credence, okay.

. . . .

So I'm basically finding three enhancement factor[s], also the fact that he has basically led a life of crime. He's had several probation revocations, parole. With that I'm going to put him up to 12 years.

-27-

We note that the court applied mitigating factor (13) because the court determined the Defendant was entitled to a "little break" because he was "shot at" and "rammed" by a truck while driving the ATV. *See id.* § 40-35-113(13).

The record reflects that the trial court applied enhancement factors (1), (8), and (13). *See id.* § 40-35-114(1), (8), (13). The court properly found that the Defendant had multiple criminal convictions in addition to those rendering him a Range III, persistent offender, that the Defendant was serving a sentence on probation at the time of the present offense, and that the Defendant had previous probation and parole violations.

Likewise, the record reflects that the trial court applied the purposes and principles of sentencing in determining the Defendant's sentence. The court considered the presentence report, the nature and circumstances of the offense, and the evidence presented at the trial and at the sentencing hearing. The court found that the Defendant's criminal history had spanned twenty years. The court determined that the Defendant was untruthful during his trial testimony and failed to take responsibility for his criminal conduct. The court also found that the Defendant's criminal history rendered him a poor candidate for rehabilitation and that society needed protection from his lengthy criminal conduct. The Defendant was sentenced as a Range III, persistent offender for a Class D felony, which provided for a sentence of not less than eight years nor more than twelve years. *See id.* § 40-35-112(c)(4) (2014). The sentence imposed by the court was within range and supported by the evidence. The court did not abuse its discretion, and the Defendant is not entitled to relief on this basis.

## D. Consecutive Service

The Defendant contends that the trial court erred by ordering his sentence be served consecutively to a sentence for which he was serving on probation at the time of the present offense. Although the Defendant does not dispute that he has an extensive criminal history and was serving a sentence on probation at the time of the present offense, he argues that the court did not review the relevant statutory criteria permitting the imposition of consecutive service. The Defendant's brief states that he "presumes" the court imposed consecutive service based upon the court's finding that the Defendant had an extensive criminal record and that the Defendant was a dangerous offender. The State responds that the court properly ordered consecutive service because the Defendant was serving a sentence on probation at the time he committed the offense in this case.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose

consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed," and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

Although the record reflects that the trial court did not specifically identify any statutory section when determining the length of the sentence and whether to impose consecutive service with the sentence the Defendant was serving on probation at the time of the offense, the record reflects that the court made the proper determinations to support consecutive service. After determining the applicable mitigating and enhancement factors but before determining the length of the sentence and whether to impose consecutive service, the court found that the Defendant was a professional criminal who had devoted his life to criminal conduct and that the Defendant was on probation at the time of the offense. *See* T.C.A. § 40-35-115(b) (1)-(2), (6). Nothing in the record suggests the court imposed consecutive service because the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. *See id*. (b)(4). The evidence at the sentencing hearing established that the Defendant had an extensive criminal history, that he was a professional criminal based upon his previous convictions, and that the Defendant was serving a sentence on probation at the time he committed the offense in this case. The court's imposition of consecutive service is supported by the record, and the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE